**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

SHAWNA EARLEY                      §
                                   §
VS.                                §           No. 5:21cv103-RWS-JBB
                                   §
COMMISSIONER OF SSA                §

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

On August 26, 2021, Shawna Earley ("Plaintiff") initiated this civil action pursuant to the Social Security Act ("The Act"), Section 405(g) of Title 42 for judicial review of the Commissioner's denial of Plaintiff's application for Social Security benefits. The Court is of the opinion the above-entitled Social Security action should be **AFFIRMED**.

**HISTORY OF THE CASE**

On November 27, 2018, Plaintiff protectively filed applications for disability insurance benefits and supplemental security income, alleging she became disabled on November 12, 2012. Plaintiff's applications were denied initially and on reconsideration (Dkt. No. 5 ("Tr.") at 141-48, 152-57). Pursuant to Plaintiff's request, an Administrative Law Judge ("ALJ") held a *de novo* administrative hearing on November 24, 2020 (Tr. 29-65). During the hearing, Plaintiff amended her onset date of disability to April 29, 2017 (Tr. 32). On December 29, 2020, the ALJ entered an unfavorable decision (Tr. 7-28). The Appeals Council denied Plaintiff's request for review on June 22, 2021, making the ALJ's decision the final decision of the Commissioner for judicial review under 42 U.S.C. § 405(g) (Tr. 1-4).

## STATEMENT OF THE FACTS

### *Age, education, and work experience*

Plaintiff was born on March 30, 1971, was forty-one years of age at her amended onset date of disability, and was forty-nine years of age at the time of the ALJ's decision. (Tr. 22, 37). Plaintiff has a high school education and past work experience as a home health provider and cafeteria attendant (Tr. 22, 53).

### *Medical record evidence*

The record reflects that Plaintiff has a history of receiving medical treatment through Paris Heathcare Group for multiple medical conditions since May 14, 2015 (Tr. 381-527). As of September 27, 2016, Ravi Kumar Sreerama, M.D., reported that Plaintiff's medical problems included hypothyroidism, hyperlipidemia, depressive disorder, carpal tunnel syndrome, neuropathy, essential hypertension, gastroesophageal reflux disease, menopausal syndrome, polyarthropathy, cervical radiculopathy, fibromyositis, neuralgia, foot pain, epistaxis, increased urinary frequency, hyperglycemia, and low back strain (Tr. 425). At that time, Plaintiff reported feeling tired all the time (Tr. 426). She further reported muscle aches, joint pain, and burning legs (Tr. 427). On examination, her gait and station were normal (Tr. 428).

At her follow-up visit with Dr. Sreerama on December 13, 2016, Plaintiff's prescribed medications included Alprazolam, Amitriptyline, Amoxicillin, Effexor, Gabapentin, Levothyroxine, Lorazepam, Naprosyn, Nexium, Premarin, Symbicort, Tramadol, Triamterene, and Tylenol #3 and #4 (Tr. 419). On this date, Plaintiff reported wheezing and shortness of breath, and on examination she had inspiratory and expiratory wheezing (Tr. 420-21). Dr. Sreerama also noted that Plaintiff was morbidly obese (Tr. 420). Plaintiff was given an injection of Kenalog, prescribed Symbicort to treat exacerbation of asthma, and prescribed Tramadol for treatment of

chronic back pain (Tr. 421). Dr. Sreerama remained Plaintiff's primary treating physician at Paris Healthcare Group through at least November 9, 2020 (Tr. 1072). Plaintiff's further treatment reports with Dr. Sreerama reflect that Plaintiff often reported widespread joint and/or muscle pain (Tr. 384, 387, 409, 416, 424, 427, 1076, 1082, 1087, 1088).

On examination on September 7, 2017, Dr. Sreerama reported that Plaintiff appeared to be in moderate distress and chronically ill. Plaintiff had tenderness and limited range of motion of her elbows, knees, and wrists (Tr. 417). Dr. Sreerama prescribed Zanaflex for treatment of fibromyalgia, continued Tramadol for the treatment of polyarthropathy, and prescribed Wellbutrin for the treatment of depression (Tr. 417).

On September 14, 2017, Plaintiff was given another Kenalog injection and prescribed Prednisone for the treatment of temporomandibular joint dysfunction syndrome (Tr. 413). Plaintiff was given a further injection of Kenalog on December 11, 2017, after another asthma exacerbation, and was given a referral to pain management for treatment of chronic pain syndrome (Tr. 403). On January 30, 2018, Plaintiff was given a gynecology referral by Dr. Sreerama for uterine prolapse (Tr. 396).

On March 12, 2018, Plaintiff reported muscle aches, arthralgias/joint pain, back pain, and urinary loss of control. On examination, Dr. Sreerama noted Plaintiff had tenderness and limited range of motion of the lumbar spine, as well as 1+ edema of the extremities (Tr. 387-88). Dr. Sreerama prescribed Maxzide for edema and Ditropan for urinary incontinence (Tr. 388). On October 29, 2018, Plaintiff again reported muscle aches, arthralgias/joint pain, and back pain. On examination, Plaintiff had musculoskeletal tenderness and multiple trigger points, but her gait and station were normal (Tr. 384). Dr. Sreerama prescribed Cyclobenzaprine for the treatment of fibromyalgia (Tr. 384).

On April 22, 2019, Dr. Sreerama completed an "Application for Persons with Disabilities Parking Placard and/or License Plate" for Plaintiff for permanent disability (Tr. 925-26). On further follow-up visits with Dr. Sreerama in August, September, and November 2020, Plaintiff continued to report arthralgias/joint pain, including pain in her back, hands, and feet (Tr. 1076, 1082, 1087, 1088). Dr. Sreerama's diagnoses included polyarthropathy with elevated erythrocyte sedimentation rate ("ESR") (Tr. 1077, 1088).

In a medical source statement dated November 17, 2020, Dr. Sreerama reported that Plaintiff could not consistently perform work requiring her to be on her feet longer than two hours during an eight-hour workday; could not lift ten pounds frequently and twenty pounds occasionally; would need additional breaks during an eight-hour workday totaling one hour; could occasionally reach, handle, and finger; could frequently feel; would miss work more than ten days per month on average; and would be off task more than 25% of an eight-hour workday (Tr. 1061-65).

During the relevant time period, Plaintiff also received treatment for fibromyalgia through the Paris Healthcare Group Rheumatology Clinic with Thamilvani Thiruvasahar, M.D. (Tr. 598-619). Plaintiff reported to Dr. Thiruvasahar on November 1, 2017, complaining of night sweats, vision change, shortness of breath when walking and lying down, arthralgias/joint pain, back pain, swelling in her joints, fatigue, and heat intolerance (Tr. 614). Dr. Thiruvasahar noted that Plaintiff's ESR was elevated (Tr. 610, 615). On examination, Plaintiff demonstrated musculoskeletal tenderness, tender trigger points, tenderness of her feet on squeeze of the metatarsophalangeal (MTP), and tenderness of her hands, wrists, and ankles (Tr. 614). Dr. Thiruvasahar assessed primary fibromyalgia syndrome, myalgia, and dysthymic disorder. Dr. Thiruvasahar referred Plaintiff for physical, occupational, and aquatic therapy (Tr. 614).

On follow-up with Dr. Thiruvasahar on November 21, 2017, Plaintiff reported she was hurting all over and nothing had changed (Tr. 613). Examination was unchanged, and Dr. Thiruvasahar again noted that Plaintiff's ESR was raised (Tr. 614-15). When Plaintiff returned to Dr. Thiruvasahar on November 27, 2018, she reported night sweats, dry eyes, mouth ulcer, wheezing and shortness of breath, abdominal pain, muscle aches and weakness, arthralgias/joint pain, back pain, swelling in her extremities and joints, AM stiffness, weakness and numbness, depression, sleep disturbance, anxiety, restless sleep, fatigue, and easy bruising (Tr. 609). Examination remained basically unchanged with the addition of shoulder tenderness to palpation (Tr. 609-10). Dr. Thiruvasahar noted that Plaintiff was on multiple medications by her pain management doctor, and he again referred Plaintiff for aquatic therapy to treat fibromyalgia (Tr. 610).

During a follow-up visit at Paris Healthcare Group on March 19, 2019, Plaintiff reported to Kerri Huddleston, RN, FNP-BC, right shoulder pain for one week, myalgia, and arthralgias/joint pain (Tr. 939). On examination, nurse practitioner Huddleston noted that Plaintiff had tenderness and limited range of motion of her right shoulder. Plaintiff was given a Kenalog injection to treat a suspected strain/arthritis (Tr. 940).

Plaintiff reported on follow-up with nurse practitioner Huddleston on May 2, 2019, complaining of continuing right shoulder pain as well as increasing pain in her wrists and hands (Tr. 931). A right shoulder x-ray on May 3, 2019 showed degenerative changes of the acromioclavicular joint (Tr. 946-47). A magnetic resonance imaging scan (MRI) of Plaintiff's right shoulder on October 14, 2019 showed moderate acromioclavicular joint osteoarthritis, supraspinatus and infraspinatus tendinopathy with articular and bursal surface fraying, and mild tenosynovitis of the extra-articular biceps tendon (Tr. 1096).

Upon referral by Dr. Sreerama, Plaintiff received gynecological care from Tuesday Chadwick, M.D., beginning February 14, 2018 (Tr. 632-55). On initial presentation to Dr. Chadwick, Plaintiff reported right-sided pelvic pain and feeling like her uterus was bulging when she used the restroom (Tr. 647). On examination, Dr. Chadwick noted cystocele and rectocele, and he assessed menorrhagia, midline cystocele, herniation of rectum into vagina, and urinary incontinence (Tr. 651). Dr. Chadwick ordered a sonogram (Tr. 651). A transvaginal sonogram on February 27, 2018 showed Plaintiff had diffuse endometrial thickening with echogenic material in the cervix, unilocular cysts of both ovaries, and a cystic lesion of the left ovary (Tr. 544). Dr. Chadwick performed a robotic-assisted hysterectomy with bilateral salpingo-oohorectomy, anterior and posterior repair, and sling on March 21, 2018 (Tr. 360-63).

On May 17, 2018, six weeks post-operation, Plaintiff reported to Dr. Chadwick dysuria and urinary frequency with the urge to urinate, but inability to void (Tr. 836). Dr. Chadwick prescribed Estradiol and referred Plaintiff to Jay Carpenter, M.D. (Tr. 836). On presentation to Dr. Carpenter on June 6, 2018, Plaintiff reported continuing urinary urgency associated with urge incontinence (Tr. 1001). Dr. Carpenter prescribed Oxybutynin (Tr. 1001).

On follow-up with Dr. Carpenter on September 12, 2018, Plaintiff reported doing well with her urinary urgency and urge incontinence, but she was having intermittent bladder spasms two to three times per week (Tr. 1004-05). Dr. Carpenter increased Plaintiff's dose of Oxybutynin (Tr. 1005). When Plaintiff returned to Dr. Carpenter on March 12, 2019, she reported having been prescribed an increased dose of Oxybutynin at the emergency room the previous September, but was continuing to have symptoms of urgency and urge incontinence (Tr. 1007). Dr. Carpenter noted that due to Plaintiff's insurance, treatment options were limited (Tr. 1007). Dr. Carpenter started Plaintiff on a trial of Myrbetriq for persistent urgency and frequency (Tr. 1008).

During the relevant time period, Plaintiff also received pain management treatment with Ifteqar Syed, M.D., from October 16, 2018, through February 18, 2020, for wide spread pain of an average intensity of 6/10 to 8/10 (Tr. 808-13, 1020-50). Dr. Syed's diagnoses included fibromyalgia, neuropathy, insomnia, chronic depression, and osteoarthritis of the right acromioclavicular joint (Tr. 809, 812, 1022, 1024-25, 1028, 1031, 1034, 1037, 1040, 1042-43, 1046, 1050). Dr. Syed's prescribed medications included Percocet, Diclofenac, Voltaren gel, Gabapentin, Talwin, Dilaudid, Flector patch, Methadone, Robaxin, Nabumetone, Skelaxin, Belsomra, and Cymbalta (Tr. 810, 813, 1022, 1025, 1028, 1031, 1034, 1037, 1043, 1046, 1050).

Peter J. Edenhoffer, M.D., reported on October 19, 2016, that an electromyography (EMG) and nerve conduction study on October 19, 2016, showed sensory polyneuropathy with absent responses in the right lower extremity, bilateral carpal tunnel syndrome, and bilateral  ulnar neuropathy at Guyon's canal (Tr. 883-87).

A consultative psychological evaluation by David R. Grant, Ph.D., on March 27, 2019, showed Plaintiff to have a depressed mood and flat affect. Plaintiff was unable to complete serial 7s, but she could recall zero of three items after five minutes (Tr. 920-22). Dr. Grant diagnosed major depressive disorder, recurrent, moderate; generalized anxiety disorder; and panic disorder (Tr. 922). Dr. Grant opined Plaintiff was able to understand, follow, and carry out instructions, but it was unlikely she would respond appropriately to work pressure in a work setting; and, her ability to tolerate stress associated with competitive work and make reasonable occupational adjustments was poor (Tr. 923).

Plaintiff attempted to seek mental health care at Community Healthcare on June 26, 2019, and was diagnosed with major depressive disorder. Her PHQ-9 score was 24, and her global assessment of functioning (GAF) was reported as 50 (Tr. 965, 981). Plaintiff was informed that it

would be a wait of six months to a year for her to receive services through Community Healthcare (Tr. 963).

State Agency medical consultants, Cynthia Linardos, M.D., and Kavitha Reddy, M.D., opined that Plaintiff is limited to work at the light level, with occasional postural limitations as well as limited pushing, pulling, handling, and fingering. State Agency psychological consultants, Joel Forgus, Ph.D., and Matthew Turner, Ph.D., opined Plaintiff is able to understand, remember, and carry out simple instructions, make simple decisions, concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting (Tr. 66-135).

## THE HEARING

### *Plaintiff's testimony*

During the hearing, Plaintiff's counsel noted Plaintiff has a high school education and last worked on November 21, 2012. According to counsel, Plaintiff is unable to work due to pain in her legs and a 2004 injury to her back, shoulder, and neck. Specifically, Plaintiff is unable to work because of a combination of exertional and non-exertional limitations including inflammatory polyarthropathy; bilateral carpal tunnel syndrome; C7 radiculopathy; lumbar and cervical disc bulges; fibromyalgia; gastroesophageal reflux disease; fibromatosis; hypothyroidism; hypertension; hyperlipidemia; TMJ; temporomandibular joint disorder; major depressive disorder; generalized anxiety disorder and panic disorder. Plaintiff's counsel noted Plaintiff's examining psychologist opined that Plaintiff is able to understand, carry out, and follow instructions, but it would not be likely that Plaintiff would respond appropriately to work pressures due to her depressive and anxiety symptoms. Counsel also noted Plaintiff's ability to handle work stress and to make work judgments is poor (Tr. 35-36).

Plaintiff testified at the hearing that she has a driver's license; however, after driving for fifteen to twenty minutes, her hands and arms get tired and go numb and her feet and legs go to sleep (Tr. 38-39). Plaintiff noted she has carpal tunnel syndrome in both of her wrists, and she frequently experiences numbness in her hands (Tr. 39-40). Plaintiff stated she also has tender and sore fingers; she cannot grip and open things because of joints on her fingers swell; and she tends to drop things (Tr. 40). Plaintiff stated she cannot operate a keyboard (Tr. 40).

Plaintiff testified she tends to lose focus and concentration (Tr. 40-41). She loses focus on a movie within fifteen to twenty minutes (Tr. 42). She testified she will not change clothes three to four times per week, and she has crying spells four to five times per week (Tr. 49). Plaintiff testified she can lift five to ten pounds periodically, can stand about fifteen minutes before having to sit down due to pain and aching in her legs, can walk about fifteen to twenty yards, and can sit fifteen minutes before her feet and leg go numb (Tr. 41). She cannot bend over to pick something up without help straightening up. She cannot squat (Tr. 48). In addition, with her asthma, it is hard to breathe in heat or cold, and heat makes her swell (Tr. 48).

Plaintiff testified she spends most of her days in a recliner or in bed with her feet elevated and a heating pad on her back (Tr. 41-42). She stated she will help her mother around the house with things like folding towels on days she feels good. She has good days about three days per week (Tr. 42). Plaintiff only socializes with family, and she is very irritable around others (Tr. 43). Her pain medications make her very tired (Tr. 44). Plaintiff testified her hands go numb when she attempts to drive, and her feet and legs will "go to sleep." (Tr. 38-39). Plaintiff testified she has continued to have problems with urinary incontinence since her hysterectomy and sling surgery. She has to use the restroom every fifteen to twenty minutes (Tr. 45). She also has "real, real bad" swelling, and at times cannot put on her shoes because her feet are swollen (Tr. 45).

Plaintiff further testified that she hurts all over due to fibromyalgia, but especially in her feet, lower back, legs, arms, and hands (Tr. 46). She also has neuropathy, and her balance is bad so she has to hang onto something when walking (Tr. 47). According to Plaintiff, she uses a cane that was prescribed for her (Tr. 47). Plaintiff noted in 2014 Dr. Kumar prescribed a cane, but she still has difficulty using stairs (Tr. 47-48). Plaintiff also described her sleep problems, noting she may only sleep three or four uninterrupted hours because of her leg and back pain. She added this causes her to sleep throughout the day (Tr. 50-51).

### Vocational expert testimony

A vocational expert also testified at the hearing. The vocational expert characterized Plaintiff's past work as follows: (1) home health provider, SVP 3 and medium exertional level; and (2) cafeteria attendant, SVP 2 and light exertional level (Tr. 53).

The ALJ asked the vocational expert to assume a hypothetical individual of Plaintiff's age, education, and work experience who is limited to a reduced range of light work with only simple work related decisions; and no more than frequent contact with supervisors and coworkers or more than occasional contact with the general public; and who would be off task five percent of the day. According to the vocational expert, the hypothetical person would not be able to work as a home health aide but could work as a collator, office helper, or office mail clerk (Tr. 53-55).

In response to questioning by Plaintiff's attorney, the vocational expert testified that if an individual of the same age, education, and past work experience as Plaintiff were able to lift and carry ten pounds occasionally and less than ten pounds frequently; would need an additional hour of rest breaks; could occasionally reach, handle, and finger; could frequently feel; would be off task more than twenty-five percent of a workday, and would be absent from work more than twice per month, the hypothetical person would not be able to perform any work (Tr. 58-59). The

vocational expert further testified if an individual were unable to respond appropriately to work pressure, the person could not sustain competitive employment (Tr. 56).

## **APPLICABLE LAW**

### *Standard of review*

In an appeal under § 405(g), the Court must review the Commissioner's decision to determine whether there is substantial evidence in the record to support the Commissioner's factual findings and whether the Commissioner applied the proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner, *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1995), and conflicts in the evidence are resolved by the Commissioner, *Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir. 1985).

### *Entitlement to benefits*

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *Plaisance v. U.S. Comm'r, Soc. Sec. Admin.*, No. 6:18-CV-00033, 2019 WL 2608884, at *14 (W.D. La. May 13, 2019), *report and recommendation adopted sub nom. Plaisance v. U.S. Comm'r*, No. 6:18-CV-00033, 2019 WL 2607498 (W.D. La. June 25, 2019) (citing 42 U.S.C. § 423(a)). The Supplemental Security Income ("SSI") program provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled. *Plaisance*, 2019 WL 2608884, at *14 (citing 42 U.S.C. § 1382(a)(1) & (2)).

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Plaisance*, 2019 WL 2608884, at *14 (citing 42 U.S.C. § 1382(c)(a)(3)(A)). A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. *Plaisance*, 2019 WL 2608884, at *14 (citing 42 U.S.C. § 1382(c)(a)(3)(B)).

### Sequential evaluation process and burden of proof

Pursuant to the statutory provisions governing disability determinations, the Commissioner has promulgated regulations that establish a five-step process to determine whether a claimant suffers from a disability. 20 C.F.R. § 404.1520 (2012). First, a claimant who, at the time of his disability claim, is engaged in substantial gainful employment is not disabled. 20 C.F.R. § 404.1520(a)(4)(i) (2012). Second, the claimant is not disabled if his alleged impairment is not severe, without consideration of his residual functional capacity, age, education, or work experience. 20 C.F.R. § 404.1520(a)(4)(ii) (2012). Third, if the alleged impairment is severe, the claimant is considered disabled if his impairment corresponds to a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1 (2011). 20 C.F.R. § 404.1520(a)(4)(iii) (2012). Fourth, a claimant with a severe impairment that does not correspond to a listed impairment is not considered disabled if he is capable of performing his past work. 20 C.F.R. § 404.1520(a)(4)(iv) (2012). Finally, a claimant who cannot return to his past work is not disabled if he has the residual functional capacity

to engage in work available in the national economy. 20 C.F.R. § 404.1520(a)(4)(v) (2012). If, at any step, the claimant is determined to be disabled or not disabled, the inquiry is terminated. *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (citing *Lovelace v. Bowen,* 813 F.2d 55, 58 (5th Cir.1987)).

Under the first four steps of the sequential analysis, the burden lies with the claimant. *Audler,* 501 F.3d at 448. At the fifth step, the burden shifts to the Commissioner to show that there is other gainful employment available in the national economy that the claimant can perform. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical–Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen,* 810 F.2d 1296, 1304 (5th Cir.1987). However, this process is used only when an initial determination of disability is being evaluated, not when a claimant is already receiving disability benefits. *See* 20 C.F.R. § 404.1520(a)(5). The Code explicitly states, "If you are already receiving disability benefits, we will use a different sequential evaluation process to decide whether you continue to be disabled. We explain this process in § 404.1594(f)." *Id*.

## THE ALJ'S FINDINGS AND CONCLUSIONS

Having considered the evidence and applying the five-step sequential evaluation process the ALJ first found Plaintiff met the insured status requirements of the Act on March 31, 2018 (Tr. 12). At step one, the ALJ found Plaintiff did not engage in substantial gainful activity from her alleged onset date, April 29, 2017 (Tr. 12). At step two, the ALJ found Plaintiff had the severe impairments of obesity, degenerative disc disease, neuropathy, degenerative joint disease of the right shoulder, fibromyalgia, major depressive disorder, bilateral carpal tunnel syndrome, and chronic pain syndrome (Tr. 12-13). At step three, the ALJ found Plaintiff does not have an

impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 13-16).

The ALJ next found that Plaintiff has the residual functional capacity to perform light work, with limitations to frequent bilateral operation of foot and hand controls; frequent bilateral overhead reaching, handling, fingering, and feeling; frequent climbing of ramps and stairs, but occasional climbing of ladders, ropes, or scaffolds; frequent balancing, stooping, kneeling, and crouching; occasional crawling; simple oral instructions; occasional work at unprotected heights; frequent work with moving mechanical parts and/or operation of a motor vehicle; frequent exposure to dust, odors, fumes, pulmonary irritants, extreme heat or cold, and/or vibration; simple, routine tasks; frequent interaction with supervisors and coworkers; occasional interaction with the general public; simple, work-related decisions; and being off task five percent in an eight-hour workday (Tr.16-21). The ALJ further found that Plaintiff cannot perform her past relevant work (Tr. 21-22).

At step five, relying on the vocational expert's testimony, the ALJ found that, considering Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff could perform other work existing in significant numbers in the national economy (Tr. 22). Specifically, the ALJ concluded that Plaintiff could perform the representative jobs of collator, office helper, and office mail room clerk (Tr. 23). The ALJ concluded that Plaintiff was not disabled from April 29, 2017, her alleged onset date, through December 29, 2020, the date of the ALJ's decision (Tr. 23).

## ANALYSIS

"The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot find substantial evidence in the record to support the Commissioner's

decision or finds that the Commissioner made an error of law." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). Substantial evidence is a term of art used to describe how courts are to review agency fact finding. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Under the substantial-evidence standard, a court looks to the existing administrative record to determine whether it contains sufficient evidence to support the agency's factual determinations. *Id.* Although "substantial" has a different meaning in other contexts, the threshold of sufficient evidence to satisfy the substantial evidence standard "is not high." *Id.* Substantial evidence requires more than a mere scintilla of evidence, but it "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover, a claimant also bears the burden of showing any alleged error of law was prejudicial because the Supreme Court has recognized the doctrine of harmless error applies to administrative determinations, and the Fifth Circuit has specifically held it will not vacate a judgment unless the substantial rights of a party are affected. *See Shinseki v. Sanders*, 556 U.S. 396, 407-08 (2009); *Jones v. Astrue*, 691 F.3d 730, 734 (5th Cir. 2012); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

The overarching issues are whether substantial evidence of record supports the Commissioner's decision that Plaintiff was not disabled during the relevant period, and whether the ALJ applied the correct legal standards in reaching that decision. Having reviewed the parties' briefs, Plaintiff identifies the following specific issues on appeal: (1) whether the ALJ properly considered Plaintiff's fibromyalgia; and (2) whether substantial evidence and relevant legal

standards support the ALJ's residual functional capacity assessment and specifically the ALJ's reasoning for finding Dr. Sreerama's and Dr. Grant's opinions "unpersuasive." Dkt. No. 11 at 1.

In her first claim of error, Plaintiff asserts the medical evidence of records supports the existence of a severe impairment of fibromyalgia. *Id.* at 11. According to Plaintiff, even though the ALJ found fibromyalgia a medically determinable "severe" impairment at step two, he did not properly evaluate the functional effect of Plaintiff's fibromyalgia. *Id.* at 11-12. Specifically, Plaintiff asserts the ALJ relied on "inappropriate criteria" in assessing Plaintiff's residual functional capacity by placing "emphasis on physical examination findings that he found to be generally benign." *Id.* at 12 (citing Tr. 18-19). Plaintiff states that pursuant to SSR 12-2p the focus should be on "longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources," and reports from Plaintiff's "acceptable medical sources" show Plaintiff's fibromyalgia varied in severity over time. *Id.* at 13. According to Plaintiff, there were other times when she was reported to have elevated ESR and musculoskeletal tenderness. *Id.* at 15. Plaintiff argues that even with her pain management regimen, she consistently reported pain symptoms that on average ranged from 6/10 to 8/10. *Id.* at 16. Asserting the ALJ did not consider the "longitudinal record" as required by SSR 12-2p, and further asserting the ALJ's analysis instead "centered on alleged benign findings on physical examination and a misconception that medications were relatively effective in controlling her symptoms," Plaintiff asserts the ALJ committed legal error which harmed Plaintiff. *Id.* at 17.

The ALJ determined that fibromyalgia was a severe impairment at step two and specifically evaluated fibromyalgia as part of his RFC determination for purposes of steps four and five (Tr. 12, 16-23). In the residual functional capacity context, SSR 12-2p advises the ALJ to "consider a longitudinal record whenever possible because the symptoms of fibromyalgia can wax and wane

16

so that a person may have 'bad days and good days.'" SSR 12-2p, 2012 WL 3104869, at *6. According to Defendant, the ALJ's residual functional capacity discussion included citations to the medical record and addressed Plaintiff's subjective complaints of fibromyalgia, diagnostic testing for fibromyalgia, medication prescribed for fibromyalgia, and findings on physical examinations (Tr. 17-19). Although Plaintiff objects to the ALJ's interpretation of the evidentiary record, Defendant asserts that is a question of fact, not legal error. Dkt. No. 12 at 4.

According to Plaintiff, had the ALJ conducted a proper evaluation of the functional impact of her fibromyalgia, the "ALJ might well have found that [her] fibromyalgia was disabling in and of itself, or led to a more restrictive RFC." Dkt. No. 11 at 18. Plaintiff points to opinions from her treatment providers as support for her claim that the ALJ failed to properly evaluate her fibromyalgia and should have assessed a more restrictive residual functional capacity assessment.

The Court does not find, as urged by Plaintiff in her first claim of error, that the ALJ erred in evaluating the functional effect of Plaintiff's fibromyalgia. Consistent with SSR 12-2p, the ALJ applied the sequential five-step test for disability in light of Plaintiff's fibromyalgia and other severe impairments (Tr. 12-23). *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). In assessing Plaintiff's residual functional capacity, the ALJ accounted for Plaintiff's fibromyalgia symptoms and also included accommodations for her fibromyalgia (Tr. 18-20). Specifically, among other things, the ALJ stated as follows:

> To account for the claimant's obesity, degenerative disc disease, neuropathy, degenerative joint disease of the right shoulder, fibromyalgia, bilateral carpal tunnel syndrome, and chronic pain syndrome, she is limited to work at the light exertional level and can frequently operate foot controls with the bilateral feet and frequently operate hand controls with the bilateral hands.

(Tr. 20).

Additionally, as discussed in more detail below, the ALJ considered the opinion evidence consistent with the regulations when he determined Plaintiff's residual functional capacity.[1] What is more, when he assessed Plaintiff's residual functional capacity, the ALJ considered that Plaintiff's activities of daily living were not "limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 18). Plaintiff's first claim of error is without merit.

In her second claim of error, Plaintiff argues the ALJ erred in finding the medical opinions of Dr. Sreerama and Dr. Grant were "unpersuasive." Dkt. No. 11 at 19. Although Plaintiff acknowledged that the revised regulations apply because Plaintiff's claims were filed in 2018, *id.* at 19 n. 4, Plaintiff asserts the ALJ still failed to provide sufficient reasoning supported by substantial evidence for concluding that Drs. Sreerama's and Grant's medical opinions were "unpersuasive." *Id.* at 20. According to Plaintiff, the ALJ improperly relied solely upon an alleged lack of supporting objective medical findings. *Id.* at 20-22; *see also* Dkt. No. 13 at 3.

Residual functional capacity is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's

---

[1] Plaintiff's reliance on *Wyche v. Saul*, No. 3:19-CV-00396, 2020 WL 5912600 (S.D. Tex. Oct. 6, 2020) is misplaced. *See* Dkt. No. 11 at 12. In that case, the court held the ALJ's focus on the "supposed absence of acute distress and the presence of several normal examination findings" was problematic because " [a] diagnosis of fibromyalgia often lacks objective clinical findings." *Id.* at *3 (quoting *Bragg v. Comm'r of Soc. Sec. Admin.*, 567 F. Supp. 2d 893, 912 (N.D. Tex. 2008) (collecting cases)). In so ruling, the court held the ALJ did not fully consider each of the criteria set forth in 20 C.F.R. § 404.1527(c). *Id.*

As pointed out by Defendant, this case does not address the regulations revised effective March 27, 2017. Dkt. No. 12 at 7.  Rather, the court in *Wyche* was interpreting the prior regulatory authority, 20 C.F.R. §§ 404.1527, 416.927. For claims filed on or after March 27, 2017, the Agency revised its regulations such that "ALJs are no longer required to give controlling weight to a treating physician's opinion, as was mandated by federal regulations and our caselaw in the past." *Webster v. Kijakazi*, 19 F.4th 715, 718-19 (5th Cir. 2021) (citing 20 C.F.R. § 404.1520c).

residual functional capacity should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's residual functional capacity decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994).

A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). Courts "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *Jodie C. v. Berryhill*, No. 3:18-CV-1687-S-BH, 2019 WL 3101689, at *16 (N.D. Tex. May 7, 2019), *report and recommendation adopted*, No. 3:18-CV-1687-S, 2019 WL 3081538 (N.D. Tex. July 15, 2019) (citation omitted).

In its response, Defendant asserts the ALJ properly based Plaintiff's residual functional capacity on all of the relevant evidence, and substantial evidence supports this legally sufficient RFC assessment. Dkt. No. 12 at 5. The Court agrees.

Here, after considering the evidence of record, the ALJ determined Plaintiff retained the residual functional capacity to perform light work (lift, carry, push, and/or pull twenty pounds occasionally and ten pounds frequently and sit, stand and/or walk for six hours in an eight-hour workday) with mental, postural, and environmental limitations, including being off task five percent of the time in additional to normal breaks (Tr. 16). The ALJ found unpersuasive the opinions of Kumar Sreerama, M.D., that Plaintiff would need an additional hour of rest each day, would miss ten or more days per month, and would be off task for more than twenty-five percent of the workday (Tr. 21). Specifically, the ALJ explained as follows:

> Dr. Sreerama's opinion is unpersuasive because it is inconsistent with the evidence of record. His opinion that the claimant would be off task 25% of the time, need additional one hour breaks per day, and would miss 10 days per month is inconsistent with the claimant's generally abnormal findings on her physical examinations. Specifically, it is inconsistent with the evidence showing that the claimant had normal gait and reflexes, but had some tenderness and limited range of motion in the joints and spine. . . . Dr. Sreerama's extreme limitations are also unsupported by his examinations of the claimant which showed only tenderness in the spine and hands and some limited range of motion in the spine. . . .

(Tr. 21).

"The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (per curiam) (brackets, quotations, and citation omitted). Defendant asserts Dr. Sreerama's November 2020 opinion consists of a five-page checklist/short-answer form with no supporting documentation. Dkt. No. 12 at 8 (citing Tr. 1061-71). According to Defendant, the Fifth Circuit discounts such opinions. *Id.* (citing *Simmons v. Colvin*, 635 Fed. Appx. 512, 515 (5th Cir. 2015) (Check-box opinions without

further explanation are rightly discounted); also citing *Foster v. Astrue*, 410 Fed. Appx. 831, 833 (5th Cir. 2011) (finding good cause to assign little weight to a treating physician's questionnaire opinion "due to its brevity and conclusory nature, lack of explanatory notes, or supporting objective tests and examination. . ."); *see also Segovia v. Astrue*, No. H-11-0727. 2012 WL 948815, at *17 (S.D. Tex. Mar. 2, 2012), *report & recommendation adopted*, 2012 WL 951543 (S.D. Tex. Mar. 19. 2012); *Gannon v. Astrue*, No. 3:07-CV-1057-N, 2008 WL 4490738, at *14 (N.D. Tex. Oct. 3, 2008) (the doctor's statements were brief and conclusory, and a testifying medical expert described the treating doctor's residual functional capacity assessment "as going to an extreme" without evidentiary support in the record).

The ALJ found Dr. Sreerama's November 2020 checklist opinion was not persuasive because it was inconsistent with evidence in the record and with Dr. Sreerama's own examinations of Plaintiff showing only tenderness of the spine and some limited range of motion of the spine, which included an examination conducted on November 9, 2020 (Tr. 21, 1061-71, 1076, 1082-83, 1087-88). Dr. Sreerama's opinion was not supported by any narrative explanation other than the diagnoses and primary symptom of pain (Tr. 1061-71). *See Scott v. Heckler*, 770 F.3d 482, 485 (5th Cir. 1985) (physician "leaning over backwards to support the application for disability benefits"). Moreover, not all pain is disabling and subjective evidence need not be credited over conflicting medical evidence. *See Anthony v. Sullivan*, 954 F.2d 289, 296 (5th Cir. 1992). "It is important to note that the test for disability under the Social Security Act is not satisfied merely because Plaintiff cannot work without some pain or discomfort." *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983). The ALJ considered that Plaintiff reported that she does some housework, is functional around her home, is able to clean her room, and rides a recumbent bike for exercise (Tr. 18, 922-2, 1045, 1049). "It is appropriate for the Court to consider the claimant's daily activities

when deciding the claimant's disability status." *Leggett v. Chater*, 67 F.3d 558, 565 n.12 (5th Cir. 1995). Here, the ALJ properly concluded that Plaintiff had "described daily activities, both in writing and at the hearing, that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 18).

Relying on *Wilkerson v. Berryhill*, No. 3:16-CV-851-BN, 2017 WL 1091601 (N.D. Tex. Mar. 23, 2017), Plaintiff claims the ALJ erred by relying "entirely upon an allegation of an absence of objective clinical findings to conclude Dr. Sreerama's medical opinion on the effects" of Plaintiff's pain was unpersuasive. Dkt. No. 11 at 20-21. However, the court in *Wilkerson* considered whether the ALJ properly considered the § 416.927(c) factors, factors which are not applicable here. The ALJ properly noted that the applicable regulations instruct that an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." (Tr. 20). *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2017).

For claims filed on or after March 27, 2017, "ALJs are no longer required to give controlling weight to a treating physician's opinion, as was mandated by federal regulations and our caselaw in the past." *Webster v. Kijakazi*, 19 F.4th 715, 718-19 (5th Cir. 2021) (citing 20 C.F.R. § 404.1520c). In the preamble to its final rules, the Agency explained that its experience adjudicating claims has shown that the relationship between a claimant and a medical source is not the most important factor when evaluating a medical opinion. *See* 82 Fed. Reg. at 5853. Rather, an opinion's consistency with other evidence in the record and its supportability are more important than the medical source's relationship with the claimant. *Id*.; *see also Webster*, 19 F.4th at 719.

In his decision, the ALJ identified physical examination findings that support the light residual functional capacity assessment (Tr. 19).[2] For example, the ALJ noted physical examinations throughout the record "generally showed benign findings including normal tone and motor strength." (Tr. 19, 384, 388, 1049). The ALJ also considered that, even though Plaintiff had tenderness at trigger points, including tenderness on hands, wrists, elbows, shoulders, feet, ankles, hips, and spine, her "providers routinely noted she had normal gait and station, ambulated normally with no need for an assistive device, and had normal sensation and reflexes." (Tr. 19, 384, 388, 809, 1015-16, 1036-37, 1039, 1049). This evidence contradicts Plaintiff's claim that her fibromyalgia is disabling, and it stands as substantial evidence supporting the residual functional capacity assessment. Plaintiff has not demonstrated that the ALJ failed to conduct a proper evaluation of Plaintiff's fibromyalgia or that the ALJ erred in evaluating the opinions of Dr. Sreerama.

The ALJ also found unpersuasive the opinions of consultative examiner David Grant, Ph.D. (Tr. 21). Dr. Grant opined that Plaintiff was not likely to respond appropriately to work pressures and that she has poor ability to tolerate stress and make reasonable occupational adjustments. According to the ALJ, although supported by Dr. Grant's "one-time examination," Dr. Grant "did not have an opportunity to observe [Plaintiff's] behavior over time." (Tr. 21). The ALJ further found Dr. Grant's opinion inconsistent with Plaintiff's mild mental status examinations showing normal mood and affect, normal memory, and stable mood (Tr. 21).

Regarding Dr. Grant, Plaintiff states the ALJ did not apply the same standard to the administrative findings of the State Agency medical and psychological consultants, finding their

---

[2] The Fifth Circuit has recognized physical examination findings as relevant and substantial evidence supporting the residual functional capacity assessment. *See Britton v. Saul*, No. 20-30025, 827 Fed. Appx. 426, 429 (5th Cir. 2020); *Winston v. Saul*, No. 17-11173, 755 Fed. Appx. 395, 401 (5th Cir. 2018); *see also Ross v. Comm'r, S.S.A.*, No. 6:20-cv-00306, 2021 WL 2935650, at *1 (E.D. Tex. July 13, 2021).

opinions were "persuasive" even though they did not ever examine Plaintiff. Dkt. No. 11 at 22. Plaintiff asserts the ALJ's reasoning is in conflict with the Agency's recognition of the expertise of consultative examiners and the value of their examinations. *Id.* at 22-23.

The ALJ considered Dr. Grant's March 2019 consultative opinion that Plaintiff was "able to understand, carryout, and follow instructions" and was "not likely" to respond appropriately in a work setting, but he also considered the record as a whole and determined that this opinion was not consistent with evidence showing Plaintiff's mild mental status examinations showing normal mood and affect, normal memory, and stable mood, including an examination in November 2020 (Tr. 21, 919-23, 1075-86). The relative weight to be given the evidence is within the ALJ's discretion. *See Chambliss v. Massanari*, 269 F.3d 520, 523 (5th Cir. 2001). The Court agrees with Defendant that the ALJ was not bound by medical opinions he found not supported by the evidence.

Plaintiff has not shown the ALJ erred in evaluating the opinions of Dr. Grant. Nor has Plaintiff shown the ALJ's decision fails to comport with proper legal standards. The Court finds the ALJ properly assessed Plaintiff's residual functional capacity consistent with the evidence as a whole, and substantial evidence supports the RFC assessment.

## **RECOMMENDATION**

"The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot fund substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law." *Legget v. Chater*, 67 F.3d 558, 565-66 (5th Cir. 1995). Having reviewed the record, the Court determines the record shows that the Administration correctly applied the applicable legal standards and that substantial evidence supports the Administration's determination that Plaintiff is not disabled. Accordingly, it is

**RECOMMENDED** the above-entitled Social Security action be **AFFIRMED.**

<u>Objections</u>

Within fourteen (14) days after service of the Magistrate Judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C). Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court, except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriquez v. Bowen*, 857 F.2d 275, 267-77 (5th Cir. 1988).

SIGNED this the 23rd day of February, 2023.

_____

J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE